**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

RALPH REEDER, M.D.,

          Plaintiff,

vs.

THOMAS CARROLL, M.D.,

          Defendant.

No. 09-CV-4013-LRR

**ORDER**

———————————

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . **3**

V.     **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **4**

      *A.*     *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
             *1.*     *Dr. Reeder* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
             *2.*     *Dr. Carroll* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
      *B.*     *The Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
      *C.*     *Circumstances Leading to the Letter* . . . . . . . . . . . . . . . . . . . . . . . **9**
      *D.*     *The Gregory Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
      *E.*     *The Unsigned Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
      *F.*     *The Email* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
      *G.*     *The Board's Investigative Procedure* . . . . . . . . . . . . . . . . . . . . . **13**
             *1.*     *Chapter 653 investigation procedure* . . . . . . . . . . . . . . . **13**
             *2.*     *Kent Nebel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
             *3.*     *The Board's charges* . . . . . . . . . . . . . . . . . . . . . . . . . **16**

VI.   *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

      *A.*     *Legal Background: Defamation and False Light Claims* . . . . . . . . **17**
             *1.*     *Defamation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
                     *a.*     *Defamation per se* . . . . . . . . . . . . . . . . . . . . **18**

|  |  | b. | Qualified privilege | . . . . . . . . . . . . . . . . . . . . . . . | 18 |
|  |  | 2. | False light invasion of privacy | . . . . . . . . . . . . . . . . . . . . | 20 |
|  | B. | Slander | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 |
|  |  | 1. | Merits | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 |
|  |  | 2. | A stay of the motion | . . . . . . . . . . . . . . . . . . . . . . . . | 22 |
|  |  | 3. | Conclusion | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
|  | C. | Civil Conspiracy | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23 |
|  | D. | Libel and False Light | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
|  |  | 1. | Statements at issue | . . . . . . . . . . . . . . . . . . . . . . . . . | 24 |
|  |  |  | a. | The Unsigned Letter | . . . . . . . . . . . . . . . . . . . . | 25 |
|  |  |  | b. | The Gregory Letter | . . . . . . . . . . . . . . . . . . . . . . | 25 |
|  |  |  | c. | The Email | . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
|  |  |  | d. | Conclusion | . . . . . . . . . . . . . . . . . . . . . . . . . | 29 |
|  |  | 2. | Application | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
|  |  |  | a. | Immunity and qualified privilege | . . . . . . . . . . . . . | 30 |
|  |  |  |  | i. | Chapter 653 immunity | . . . . . . . . . . . . . . . | 30 |
|  |  |  |  | ii. | Qualified privilege | . . . . . . . . . . . . . . . . . . | 32 |
|  |  |  | b. | Malice | . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 35 |
|  |  |  |  | i. | Parties' arguments | . . . . . . . . . . . . . . . . | 36 |
|  |  |  |  | ii. | Analysis | . . . . . . . . . . . . . . . . . . . . . . | 36 |
|  |  |  | c. | Conclusion | . . . . . . . . . . . . . . . . . . . . . . . . . | 39 |
| VII. | CONCLUSION | | | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40 |

## I. INTRODUCTION

The matter before the court is Defendant Thomas Carroll's "Motion for Summary Judgment" ("Motion") (docket no. 45).

## II. PROCEDURAL BACKGROUND

On February 15, 2009, Plaintiff Ralph Reeder, M.D., ("Dr. Reeder") filed a three-count Complaint (docket no. 1). In the Complaint, Plaintiff asserted claims against Defendant Thomas Carroll, M.D., ("Dr. Carroll") for slander, libel and false light invasion of privacy. On April 6, 2009, Dr. Carroll filed an Answer (docket no. 10), in which he denied the substance of the Complaint and asserted affirmative defenses.

On September 10, 2009, Dr. Reeder filed an Amended Complaint (docket no. 17),

in which he reasserts his claims against Dr. Carroll for slander, libel and false light invasion of privacy. Dr. Reeder also added a claim against Dr. Carroll and the Iowa Board of Medicine ("Board") for civil conspiracy to commit false light invasion of privacy. On September 23, 2009, Dr. Carroll filed an Answer (docket no. 19) to the Amended Complaint.

On October 14, 2009, the Board filed a Motion to Dismiss (docket no. 20). The Board argued it was immune from suit in this court pursuant to the Eleventh Amendment to the United States Constitution. On October 28, 2009, Dr. Reeder filed a Resistance to the Board's Motion to Dismiss. On March 5, 2010, the court entered an Order (docket no. 40) granting the Board's Motion to Dismiss, leaving Dr. Carroll as the sole defendant.

On August 31, 2010, Dr. Carroll filed the Motion. On October 4, 2010, Dr. Reeder filed a Resistance (docket no. 48). On October 12, 2010, Dr. Carroll filed a Reply (docket no. 49). Dr. Reeder requests oral argument on the Motion. The court finds that oral argument is unnecessary. The Motion is fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

There is complete diversity of citizenship among the parties. The amount in controversy exceeds $75,000. The court is satisfied that it has diversity subject matter jurisdiction over the instant action. *See* 28 U.S.C. § 1332(a).

### IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see, e.g.*, *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the facts in the light most favorable to Dr. Reeder and affording him all

reasonable inferences, the undisputed facts are as follows:

## A. Parties

### 1. Dr. Reeder

Dr. Reeder is a founding member and owner of the Center for Neurosciences, Orthopaedics and Spine, PC ("CNOS"). CNOS is a group comprised of neurologists, psychiatrists, plastic surgeons and rheumatologists, as well as nurse practitioners and physician's assistants. CNOS and Dr. Reeder are part owners of the Siouxland Surgery Center ("Surgery Center"). The Surgery Center, located in Dakota Dunes, South Dakota, provides services to patients in the Sioux City, Iowa area. "Dr. Reeder was one of the leaders in CNOS's decision to acquire and operate a specialty surgery center." Plaintiff's Statement of Material Facts ("Pl. Statement of Facts") (docket no. 48-1) at ¶ 4. Since 1999, Dr. Reeder has served as Chairman of the Surgery Center.

### 2. Dr. Carroll

Dr. Carroll is employed by and is a 25% owner of Pathology Medical Services of Siouxland ("PMSS"), a professional corporation in Sioux City, Iowa. Dr. Carroll receives a 25% share of PMSS's profits. PMSS provides pathology services to several hospitals and facilities, including St. Luke's Regional Medical Center ("St. Luke's"). St. Luke's is PMSS's largest customer, accounting for approximately 40 to 50% of PMSS's business and profits. Since 1992, Dr. Carroll has been on the St. Luke's medical staff. From 2000 to 2002, Dr. Carroll served as the St. Luke's Medical Staff President. He has also served on the Medical Executive Committee and currently serves as an at-large member of the Medical Executive Committee. In addition to his medical practice at St. Luke's, Dr. Carroll is the Woodbury County, Iowa Medical Examiner.

Dr. Carroll believes that it is inappropriate and unethical for physicians to own a surgery center or hospital and that physicians should not make money off of such ownership. Dr. Carroll believes a physician's ownership in a surgery center or hospital

may cloud a physician's judgment. He explained:

> A physician who recommends a procedure for a patient is doing so because he feels in his best judgment the patient needs that particular procedure, whether it is a medical procedure or a surgical procedure. When a physician is able to refer a patient to an entity that he owns, in addition to being compensated, and the surgery may be appropriate, but he also participates in the fee that the hospital entity makes as part of that hospitalization.

Plaintiff's Appendix ("Pl. App'x") (docket no. 48-3) at 14. Dr. Carroll believes it is improper for CNOS to hold an ownership interest in the Surgery Center. He has held this view since the Center's inception.

Dr. Carroll has shared his opinion of physician ownership with others, including his father and brother, both of whom are or were physicians. Dr. Carroll has also shared this opinion with a Dr. Herbek and Peter Thoreen, the CEO of St. Luke's Hospital System. With respect to his conversation with Peter Thoreen, Dr. Carroll explained:

> I just shared my opinion . . . that I believe it is unethical for physicians to own an entity in which they have access to a facility fee because what ultimately, what happens with that is that that takes revenue that the hospitals, both Mercy or St. Luke's, would generate by having the surgery done at their hospital that can be used to further upgrade or update technologies or other services such as diabetes education, that sort of thing, that go into the pot that provide the services and the mission that hospitals have in a community.

*Id.* at 16.

In May of 2008, at the request of Peter Thoreen, Dr. Carroll traveled to Washington, DC to attend an American Hospital Association and Iowa Hospital Association meeting. Dr. Carroll testified that, during this trip, he met with the offices of three legislators and he "believe[s]" he shared his views on physicians' ownership of surgery centers "in one or two of the offices . . . ." *Id.* at 32.

6

### B. The Letter

On February 16, 2004, Dr. Carroll sent a letter (the "Letter") to the Board. The Letter stated:

> Dear Mr. Knapp:
>
> In regard to our recent conversation, I am a pathologist with Pathology Medical Services of Siouxland in Sioux City, IA. I practice at St. Luke's Regional Medical Center and I am the Woodbury County Medical Examiner.
>
> Dr. Ralph R. Reeder is a neurosurgeon licensed in the State of Iowa who practices at The Center for Neurosciences Orthopaedics & Spine PC, 575 Sioux Point Rd., Dakota Dunes, SD 57049. There are 3 patients whom I am aware of who have had adverse outcomes when Dr. Reeder had performed cervical spinal fusions utilizing fixation plates. In my opinion, one of these patients died as a consequence of the surgery. The other two patients died from other causes in which the surgery contributed to, but did not cause their death. I believe that in some of these cases, there were more conservative methods to treat these patients given their underlying disease processes which may have resulted in a less adverse outcome. Brief summaries of the three cases are submitted.
>
> E. Dorothy Lohry was an 84 year old white female who had an anterior cervical spine fusion with a fixation plate on 2/9/04 at the Siouxland Surgical Center, 600 Sioux Point Rd, Dakota Dunes, SD 57049 which is a licensed hospital in South Dakota. Postoperatively, she had an episode of paraplegia which required intubation. She was transferred from the Surgery Center to the ICU at St. Luke's Regional Medical Center, 2720 Stone Park Blvd., Sioux City, IA, 51104. Shortly before or after arriving, she reportedly recovered some of her limb function. While undergoing an MRI scan at St. Luke's, she was being manually ventilated and suffered a respiratory arrest secondary to a pneumothorax. It was reported that the ventilation device had malfunctioned. As a consequence, she developed an anoxic encephalopathy. She was removed from

the ventilator the next morning and declared dead. This information was given to me from healthcare providers. After reviewing the circumstances of her death, this death did not meet the criteria for medical examiner jurisdiction. The family refused a hospital autopsy.

Melvin D. Carr was a 64 year old white male on whom I performed a medical examiner autopsy. Mr. Carr was rear-ended by another vehicle on Interstate 29 on 1/16/2000. He suffered multiple injuries that included fractured pelvic bone, multiple abrasions and lacerations. He suffered a facet fracture of C5-6 and an anterior longitudinal ligament tear. His history was significant for coronary artery bypass graft several years ago. He reportedly has had three myocardial infarcts. In February 1998, he had insertion of a pacemaker/defibrillator for control of tachycardia. He had a low ejection fraction (15%) and dilated cardiomyopathy. He was taken to surgery on 1/20/2000 for placement of a cervical spine fixation plate. Postoperatively, he had a hypotensive event leading to a cardiac arrest. Although he was resuscitated, he suffered anoxic encephalopathy. The family decided to withdraw resuscitative efforts and he was declared dead on 1643 hours on 1/21/00. The probable cause of death was severed atherosclerotic and hypertensive cardiovascular disease. Factors which contributed to his death but did not cause his death were his multiple traumatic injuries and the cervical spine surgery.

Timothy F. Smith was a 50 year [old] white male on whom I performed a medical examiner autopsy. Mr. Smith had been admitted to Mercy Medical Center for repair of cervical spondylosis secondary to disc herniation at C4-5 and C5-6 levels. He had an anterior cervical spine repair with fixation plate placement. The surgical procedure was uneventful. He was discharged at approximately 1800 hours from the Mercy Medical Center ambulatory area in stable condition. His daughter was driving him home when he began to complain of some discomfort in the neck region. He removed the neck collar. While driving through Moville, Ia, he complained of further discomfort and was unable to drink any water. The

daughter stopped the car and made a phone call for assistance. When she returned to the car, he was not breathing. Paramedics at the scene were unsuccessful in their attempt to intubate him. He was bagged with a mask while CPR was performed. He was air-flighted to Mercy Medical Center. Despite resuscitative efforts, which included tracheostomy placement, he was declared dead at 2119 hours. The most significant findings at autopsy revealed a large retropharyngeal and retroesophageal hemorrhage/hematoma which was anterior to the operative site. The most probable cause of death was acute upper airway obstruction due to postoperative hemorrhage/hematoma in the retropharyngeal space due to surgical fusion of the cervical spine.

I have overheard other physicians state that Dr. Reeder has been investigated by Mercy Medical Center in Sioux City for concerns related to quality of patient care issues but I am not familiar with any of those cases.

Sincerely yours,

Thomas J. Carroll, M.D., Ph.D.

Defendant's Appendix ("Def. App'x") (docket no. 45-3) at 4-5.

### C. Circumstances Leading to the Letter

Dr. Carroll learned of Dorothy Lohry's situation from a Dr. Bainbridge, who contacted Dr. Carroll the day after Lohry's surgery. Dr. Carroll believed that Dr. Bainbridge was Lohry's "treating physician" and "took care of [her] when she came to St. Luke's." Pl. App'x at 21. Dr. Bainbridge told Dr. Carroll about the ventilation device malfunction. Dr. Carroll testified that, during this conversation, Dr. Bainbridge did not indicate to him that Dr. Reeder "did anything wrong." *Id.* at 26.

Dr. Carroll did not believe that Lohry's death was a "medical examiner case" because Lohry "died in the hospital due to a medical mistake, and in general one does not get involved too much with those cases as it doesn't necessarily fall in the purview of the medical examiner." *Id.* at 22. Because it was not a medical examiner case, Dr. Carroll

did not make any findings regarding Lohry's cause of death. Dr. Carroll did not examine Lohry's medical records, did not conduct an independent investigation, did not talk to Dr. Reeder about the surgery and did not speak to any other physicians regarding the surgery. Dr. Carroll testified that, had he approached it as a medical examiner case, he would have conducted a "thorough investigation," including an autopsy, review of available medical records and possibly speak to Dr. Reeder and the "physician in charge." *Id.* at 23.

RaeAnn Isaacson is the director of compliance and risk management for St. Luke's. Isaacson testified that "it was determined that the ventilator equipment that the respiratory therapist was using to ventilate Mrs. Lohry during the procedure was incorrectly assembled and that did not allow her to be ventilated properly, and she suffered brain damage related to that." *Id.* at 67. With respect to a settlement reached between Lohry's estate and St. Luke's, Isaacson testified that she did "not recall any suggestion" that Dr. Reeder was "in any way the cause of the damages to the estate." *Id.* at 69. Isaacson testified that she does not recall Dr. Carroll ever inquiring about the circumstances of Lohry's death.

Dr. Carroll does not know anything about cervical spinal fusions utilizing fixation plates, other than knowing that they were performed in the cases of Lohry, Carr and Smith. Dr. Carroll "does not know if it is a risky surgery or if there are more conservative methods of treatment." Pl. Statement of Facts at ¶ 31. Because he is not a surgeon, Dr. Carroll is unable to determine whether things taking place in a surgery are improper, whether a surgery is necessary or whether there are more conservative methods of treatment.

In 2001, Dr. Carroll offered deposition testimony during a criminal investigation involving Carr's car accident. During this deposition, Dr. Carroll testified that Carr died from natural causes that were accelerated by the accident and stated that "[t]he immediate cause of death was the natural disease processes" but that if Carr "had not had an accident

he would not have died of these natural disease processes." Pl. App'x at 75. Dr. Carroll also testified that his "impression was that [Carr] received [the] standard of care for someone with his illnesses." *Id.* at 78.

Dr. Carroll performed medical examiner autopsies on Carr and Smith. Dr. Carroll testified that, after speaking with Dr. Bainbridge about Lohry's case, it reminded him of Carr and Smith's cases "[b]ecause the two other patients had had similar surgical procedures, and the—Mr. Smith died as a consequence of the surgery, and Mr. Carr the surgery contributed to but was not the underlying cause of his death." *Id.* at 22.

The Letter regarding Dr. Reeder was the first time that Dr. Carroll submitted a report about another physician to the Board. When asked why he sent the Letter, Dr. Carroll explained:

> I had concerns about these three patients that I became aware of as the medical examiner and that I felt that the Board of Medicine had the resources to do peer review activity to make a determination if there was anything unusual about those cases. The three cases were individuals who were high risk, and who had similar surgeries, and they either died as a consequence—one of them died as a consequence of the surgery or the surgery contributed in some way to their demise.

Def. App'x at 22-23. Dr. Carroll wrote the Letter as both a physician and as the Woodbury County Medical Examiner. Dr. Carroll testified that, after sending the Letter to the Board in 2004, he had no contact with the Board until August 2008, when the Board contacted him regarding his potential testimony about the Letter.

### D. The Gregory Letter

In February of 2004, a letter bearing the name of Dr. James Gregory (the "Gregory Letter") was sent to Ed Knapp at the Board. The Gregory Letter stated:

> Iowa Board of medical Examiners
>
> Ralph Reeder M.D. brought an elderly woman to a surgical

specialty hospital (doctor owned, Siouxland Surgical Center, Dakota Dunes, SD) and performed an elective cervical surgey on the patient despite the patient being on plavix (a blood thinner that has a PDR warning about bleeding). The patient was paralyzed after surgery and was transferred to St. Lukes Hospital in Sioux City, Iowa. There the patient died and Dr Ross Bacon blamed the respiratory therapist or the respiratory equipment. This appears to be a major medical mistake to perform an elective operation on the spine of a patient who is on an anticoagulant. Also, the anesthesiologist\CRNA failed to stop the surgery which was clearly contraindicated if the patient had been on Plavix within ten days of an elective surgery. Blaming anyone other than the surgeon is a cover-up. Dr Bacon happens to be A Quality Improvement Chairman. The Death occurred 2/9/2004 or 2/10/2004. I believe the patient was Dorothy Lohry.

James Gregory

Cc SD Board of Medical & Osteopathic Examiners

*Id.* at 1.

When asked whether he believes Dr. Carroll wrote the Gregory Letter, Dr. Reeder testified "I don't know." *Id.* at 36. Nonetheless, he does not believe that Dr. Gregory sent the Gregory Letter. Dr. Carroll testified that he does not know Dr. Gregory and that, prior to seeing it at his deposition, he had never seen the Gregory Letter.

### *E. The Unsigned Letter*

On or about April 13, 2005, an unsigned letter bearing the salutation "Dear Health Care Provider" (the "Unsigned Letter") was circulated among health care providers in the Sioux City area. *Id.* at 6. The Unsigned Letter states, in part, that Mercy Medical Center and CNOS had "teamed up to monopolize the medical market in the Siouxland area." *Id.* Although the Unsigned Letter references CNOS and its business practices, it does not refer to Dr. Reeder. Dr. Carroll testified that he did not draft the Unsigned Letter and had not seen it prior to his deposition in this case. Dr. Reeder admits he has no evidence that Dr.

Carroll drafted or sent the Unsigned Letter to anyone.

### F. The Email

On June 22, 2006, Dr. Carroll sent an email to Dr. Dale Andres. The email stated:

> this is probably why they sold 40% interest of the Dunes
> surgery center to Mercy so they could generate enough cash to
> pay the fine. Interesting development. This rumor had been
> circulating the past several months in Sioux City. You should
> be thankful that you are not here. This group has done so
> much damage to the majority of the medical community in
> Sioux City that play by the rules. take care. tjc.
>
>
> check this out
>
> http://www.usdoj.gov/usao/sd/media_news/SF-05-25-06-
> Stryker.htm

*Id.* at 3. Apparently, the link was to a Department of Justice ("DOJ") press release regarding a settlement between CNOS and DOJ. *See* Def. App'x at 37 (testimony of Dr. Reeder that the link was "to the article that the Department of Justice released regarding the settlement between CNOS and . . . the Department of Justice"); Resistance at 6 (noting that the Email referred to "federal charges against the Surgery Center"). Dr. Reeder acknowledges that the settlement between DOJ and CNOS was "public record" and that the DOJ press release contained "factual information." Def. App'x at 37.

### G. The Board's Investigative Procedure

#### 1. Chapter 653 investigation procedure

The Board's complaint and investigation procedure is set forth in Iowa Administrative Code Chapter 653. The Board opens a "complaint file" upon receiving a complaint. Iowa Admin. Code r. 653-24.2(1). "A complaint file becomes an investigative file once an investigation is ordered." *Id.* Complaints are sent to the "complaint review committee," which includes "the medical advisor, executive director, director of legal affairs, and chief investigator." *Id.* at r. 653-24.2(2)(a). After reviewing

a complaint, the complaint review committee either: (1) closes the complaint file administratively for any of three reasons;[1] (2) recommends to the Board's screening committee that the Board close the complaint file without investigation; (3) requests an investigation by seeking a letter of explanation from the physician, medical records or both; or (4) requests a full investigation. *Id.* at r. 653-24.2(2)(b)(1)-(4).

The "screening committee" assesses the complaint review committee's recommendations and either: (1) recommends to the Board that the complaint file be closed without investigation; (2) requests an investigation by seeking a letter of explanation from the physician, medical records or both; (3) reviews the letter of explanation and/or medical records and recommends to the Board that the investigative file be closed, with or without issuing an informal letter; or (4) requests a full investigation for Board review. *Id.* at r. 653-24.2(3).

The Board then reviews the screening committee's recommendations and may either: (1) close the complaint file without investigation; (2) close the investigative file that has been partially or fully investigated, with or without issuing an informal letter; or (3) request further investigation. *Id.* at r. 653-24.2(4)(a).

After completing an investigation, the investigator must prepare a report for the Board's consideration. *Id.* at r. 653-24.2(5)(d). The Board must then "review the investigative record, discuss the case, and take one of the following actions:" (1) close the investigative file without action; (2) request further investigation, including peer review; (3) meet with the licensee[2] to discuss a pending investigation; (4) issue an "informal letter

---

[1] The complaint review committee may close the complaint file administratively if the Board lacks jurisdiction, the Board is already addressing the matter or the case "is appropriate for referral to the [B]oard's Iowa physician health program . . . ." *Id.* at r. 653-24.2(2)(b)(1).

[2] A "licensee" is "a person licensed to practice medicine and surgery, osteopathic
(continued…)

of warning or education" if the Board finds there is not probable cause to file disciplinary charges; (5) file a "statement of charges" if the Board finds there is probable cause for taking formal disciplinary action against a licensee, which commences a "contested case proceeding"; or (6) request a combined statement of charges and settlement agreement to resolve a contested case proceeding.  *Id.* at r. 653-24.2(5)(e).

The Board "may assign any case to peer review for evaluation of the professional services rendered by the licensee and report to the [B]oard."  *Id.* at r. 653-24.3.  "The [B]oard or [B]oard staff shall determine which peer reviewers will review a case and what investigative information shall be referred to a peer reviewer."  *Id.* at r. 653-24.3(2).  Peer reviewers are directed to "review the information provided by the [B]oard and provide a written report to the [B]oard."  *Id.* at r. 653-24.3(6).  The report must include a statement of facts, the peer reviewers' opinion as to whether the licensee violated the standard of care and the rationale supporting the opinion.

If the Board "finds there is probable cause for taking disciplinary action against a licensee," it must "order that a contested case hearing be commenced by the filing of a statement of charges."  *Id.* at r. 653-25.4(1).

### 2.    *Kent Nebel*

Kent Nebel, the Board's legal director, testified that he is the person best suited to answer questions about the Board's investigative process.  Nebel testified that Iowa physicians are subject to a mandatory reporting obligation.  He recalled that the Board has filed charges against a physician for failure to report and that sanctions were taken against the nonreporting physician.  Nebel testified that, if a complaint is made to the Board regarding competency or care-related issues, the complaint goes to the Board for review.

---

[2](…continued)
medicine and surgery, or acupuncture under the laws of the state of Iowa."  Iowa Admin. Code r. 653-1.1.

Nebel testified that the source of a complaint is not involved in the Board's screening process and the Board does its own independent review of a complaint regardless of the source.

After reviewing a complaint, the Board decides whether peer review is appropriate. According to Nebel, the "vast majority of the Board's complaints are closed without action at the first time the Board reviews the case before any further either peer review or other action is done." Pl. App'x at 37-38. If the Board orders peer review, the Board reviews the peer reviewer's report, along with the entire file, "and then they decide what the appropriate next step is." *Id.* at 38. In some cases, the Board finds dismissal is appropriate after it has reviewed the peer review report and case file.

During his deposition, Nebel invoked confidentiality requirements and refused to discuss the details of the Board's investigation of Dr. Reeder. *See* Iowa Admin. Code r. 653-24.2(6) ("All investigative information obtained by the [B]oard or its employees or agents, including peer reviewers acting under the authority of the [B]oard, in the investigative process is privileged and confidential."). The identity of a complainant is kept confidential from the physician being investigated until formal charges are filed. Thus, Dr. Reeder did not learn of the Letter until February 2008.

### 3. *The Board's charges*

On February 11, 2008, the Board filed a "Statement of Charges" against Dr. Reeder. Pl. App'x at 45. The Board stated that it had "found probable cause to file [the] Statement of Charges" charging Dr. Reeder with "professional incompetency" and "engaging in practice harmful or detrimental to the public." *Id.* at 47-49. However, in November 2008, the Board ultimately voted to dismiss the charges against Dr. Reeder, stating that "the State is unable to prove that Dr. Reeder's care in those cases fell below the standard of care." *Id.* at 57.

## VI. ANALYSIS

Dr. Carroll asks the court to grant summary judgment in his favor with respect to all of Dr. Reeder's claims because the claims are: (1) barred by the immunity provisions of Iowa Administrative Code Chapter 653; (2) barred by a qualified privilege; and/or (3) barred by the statute of limitations. Dr. Carroll also contends that summary judgment is appropriate on Dr. Reeder's slander claim because Dr. Reeder "has no evidence that Dr. Carroll has made any oral statements defaming [Dr. Reeder]." Motion at ¶ 4. Finally, Dr. Carroll seeks summary judgment on Dr. Reeder's civil conspiracy claim "because there is absolutely no evidence of any agreement between Dr. Carroll and the Board to act in concert to place Dr. Reeder in a false light." *Id.* at ¶ 6.

### A. Legal Background: Defamation and False Light Claims

The court briefly summarizes relevant principles of defamation and false light claims under Iowa law.[3] Then, the court turns to address the merits of the Motion.

### 1. Defamation

In Iowa, "[t]he law of defamation is comprised of the twin torts of libel and slander." *Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004). "'The gist of an action for libel or slander is the publication of written or oral statements which tend to injure a person's reputation and good name.'" *Id.* (quoting *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994)). "Libel is generally a written publication of defamatory matter, and slander is generally an oral publication of such matter." *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998). To establish a prima facie case of defamation under Iowa law, the plaintiff must show the defendant "(1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Taggart v. Drake Univ.*, 549 N.W.2d

---

[3] A "district court sitting in diversity applies the substantive law of the state in which it is located." *Hammonds v. Hartford Fire Ins. Co.*, 501 F.3d 991, 996 n.6 (8th Cir. 2007) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The parties agree that Iowa law applies.

796, 802 (Iowa 1996).

### a.    *Defamation per se*

"A plaintiff alleging defamation ordinarily must prove that the statements at issue were made with malice, were false, and caused damage." *Kerndt v. Roll Hills Nat'l Bank*, 558 N.W.2d 410, 418 (Iowa. 1997). "However, some statements are defamatory per se; that is, they are of such a nature that the court can presume as a matter of law that their publication will have a defamatory effect, even without a showing by the plaintiff of malice, falsity, or damage." *Id.* "In such cases, malice is presumed." *Id.* "Defamatory statements affecting a person in his or her business, trade, profession or office" are defamatory per se. *Id.*

### b.    *Qualified privilege*

There is a limited privilege that can serve as an affirmative defense to a defamation claim. *See Taggart*, 549 N.W.2d at 803 ("Qualified privilege is an affirmative defense that must be pled and proven."). As the Iowa Supreme Court explains:

> Sometimes one is justified in communicating with others, without liability, defamatory information . . . . The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous. When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.

*Vojak v. Jensen*, 161 N.W.2d 100, 105 (Iowa 1968), *abrogated on other grounds by Barreca*, 683 N.W.2d at 117. "The burden is on the defendant to establish the existence of a qualified privilege." *Lara*, 512 N.W.2d at 785.

Previously, the Iowa Supreme Court characterized the qualified privilege doctrine as follows:

> "A qualified privilege exists with respect to statements that are otherwise defamatory if the following elements exist: (1) the statement was made in good faith, (2) the defendant had an

> interest to uphold, (3) the scope of the statement was limited to the identified interest, and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only."

*Barreca*, 683 N.W.2d at 118 (quoting *Winckel v. Von Maur, Inc.*, 652 N.W.2d 453, 458 (Iowa 2002)). However, in *Barreca*, the Iowa Supreme Court explained that it no longer approaches the issue in this way. *See id.* (quoting the four element test of *Winckel* and stating that, "[a]lthough the parties continue to frame the issue in this way, we do not"). Instead, the court's task "is simply to determine whether the occasion of [the defendant's] statement was qualifiedly privileged; if it was so privileged, it must then be determined whether that privilege was abused." *Id.* "Generally, the former question is for the judge; the latter for the jury." *Id.*

In *Barreca*, the Iowa Supreme Court relied on the Restatement (Second) of Torts ("Restatement") for guidance in determining what occasions give rise to a qualified privilege. *See id.* (citing Restatement §§ 595 & 598); *see also Park v. Hill*, 380 F. Supp. 2d 1002, 1019-20 (N.D. Iowa 2005) ("It follows from the adoption of § 593 in *Barreca* that the Iowa Supreme Court would also look to these sections of the Restatement for the description of specific 'privileged occasions.'"). The Restatement instructs courts to consider a list of factors to determine which occasions give rise to a qualified privilege. Such factors include: (1) protection of the publisher's interest; (2) protection of the interest of the recipient or third party; (3) common interest; (4) family relationships; and (5) communication to those who may act in the public interest. Restatement §§ 594-598A.

"A qualified privilege is lost when it is abused." *Barreca*, 683 N.W.2d at 117. "A qualified privilege is abused . . . when a defamatory statement is published with 'actual malice.'" *Id.* In other words, "a publication loses its character as privileged and is actionable on proof of actual malice." *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984). If a defendant is protected by a qualified privilege, the plaintiff has

the burden of proving that the defendant acted with actual malice. *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 296 (Iowa Ct. App. 1985). To show actual malice, and therefore "defeat a qualified privilege, a plaintiff must prove the defendant acted with knowing or reckless disregard of the truth of a statement." *Barreca*, 683 N.W.2d at 121. "'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Id.* at 123 (quoting *Caveman Adventures UN, Ltd. v. Press-Citizen Co.*, 633 N.W.2d 757, 762 (Iowa 2001)). "'[T]he actual malice standard require[s] a high degree of awareness of . . . probable falsity.'" *Id.* (alterations in *Barreca*).

## 2. *False light invasion of privacy*

A false light invasion of privacy claim is one of "four distinct wrongs" comprising the common law tort of invasion of privacy. *See Anderson v. Low Rent Housing Comm'n of Muscatine*, 304 N.W.2d 239, 248 (Iowa 1982). A false light claim "is predicated upon an untruthful publication which places a person before the public in a manner that would be highly offensive to a reasonable person." *Id.* The Iowa Supreme Court explained:

> [O]ne who gives publicity to a matter concerning another that
> places the other before the public in a false light is subject to
> liability to the other for invasion of his privacy, if (1) the false
> light in which the other was placed would be highly offensive
> to a reasonable person, and (2) the actor had knowledge of or
> acted in reckless disregard as to the falsity of the publicized
> matter and the false light in which the other would be placed.

*Kiesau v. Bantz*, 686 N.W.2d 164, 179 (Iowa 2004).

"The essential element of untruthfulness differentiates 'false light' from the other forms of invasion of privacy and many times affords an alternate remedy for defamation even though it is not necessary for a plaintiff to prove that he or she was defamed." *Anderson*, 304 N.W.2d at 248. A plaintiff "may recover under either defamation or false light but not both causes of action." *Bradbery v. Dubuque County*, No. 99-1881, 2001

WL 23144, at *4 (Iowa Ct. App. Jan. 10, 2001) (unpublished); *see also Beryy v. Nat'l Broad. Co., Inc.*, 480 F.2d 428, 431 (8th Cir. 1973) ("[The plaintiff] may lay his action in two theories, but will be limited to only one recovery.").

## B. Slander

Dr. Carroll seeks summary judgment on Dr. Reeder's slander claim because, "[q]uite simply, [Dr. Reeder] has no evidence that Dr. Carroll has made any oral statements defaming [Dr. Reeder]." Def. Br. at 20. Dr. Reeder contends that summary judgment on this claim is "premature." Resistance at 22. He notes that Dr. Carroll "admitted making oral statements regarding physician ownership in surgery centers to numerous persons," and explains that "[t]here are additional depositions that are required and Dr. Reeder is still developing the facts regarding [Dr. Carroll's] oral statements and the content and timing of those statements." *Id.*

### 1. Merits

The court rejects Dr. Reeder's implication that Dr. Carroll's statements about physician ownership in surgery centers, without more, constitute slander. Dr. Reeder is unable to provide any oral statement in which Dr. Carroll did anything more than state generally his opinion on the propriety of such ownership. "Opinion is absolutely protected under the First Amendment." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986). In distinguishing "fact" and "opinion," a court must consider: (1) the precision and specificity of the statement; (2) verifiability; (3) the literary context, such as tone and the use of cautionary language; and (4) the public context, such as the public or political arena in which a statement is made. *Id.* at 1302-03; *Yates v. Iowa West Racing Ass'n*, 721 N.W.2d 762, 770 (Iowa 2006) (noting the Iowa Supreme Court's reliance on *Janklow* for its adoption of the four-factor test). After considering these factors, the court concludes that Dr. Carroll's statements regarding the propriety or ethical implications of physicians' ownership in surgery centers are statements of opinion. As such, they are not actionable

as slander. *See Janklow*, 788 F.2d at 1303 ("*[N]o* opinion is actionable, whether it concerns a private person or a public figure.").[4]

### 2. A stay of the Motion

In addition to asking the court to deny the Motion with respect to his slander claim, Dr. Reeder states that, "at a minimum, the [M]otion should be stayed until such time as discovery is completed with regard to the allegations of slander." Resistance at 22. Dr. Reeder's position that discovery is ongoing is perplexing. *See* Order (docket no. 33) (granting Dr. Reeder's unopposed motion for an extension of the discovery deadline and stating "[t]he deadline for the completion of fact discovery is extended to **March 30, 2010**").[5]

In any event, the court declines Dr. Reeder's invitation to stay the Motion with respect to his slander claim. A "district court does not abuse its discretion by denying further discovery 'where the nonmoving party is not deprived of a fair chance to respond to the summary judgment motion.'" *Ballard v. Heineman*, 548 F.3d 1132, 1136 (8th Cir. 2008) (quoting *Nord v. Kelly*, 520 F.3d 848, 852 (8th Cir. 2008)). Further, Dr. Reeder states in his Resistance only that he is "still developing the facts" regarding alleged "oral statements" and his "allegations of slander." Resistance at 22. In these circumstances, the court rejects Dr. Reeder's request for additional discovery regarding alleged oral

---

[4] In addition to being non-actionable statements of opinion, Dr. Reeder puts forth no evidence that any such statement by Dr. Carroll actually referred to Dr. Reeder. Accordingly, the statements are not defamatory of Dr. Reeder and summary judgment on his slander claim is warranted on this basis as well. *See Taggart*, 549 N.W.2d at 802 (plaintiff must show that the statement was "of and concerning" the plaintiff).

[5] The court notes that on February 25, 2010, at the Board's request, the court entered an Order (docket no. 39) staying discovery pending resolution of the Board's Motion to Dismiss. However, on March 5, 2010—just eight days later—the court entered its Order granting the Board's Motion to Dismiss. Dr. Reeder had a sufficient opportunity to conduct discovery on his slander claim or, in the alternative, seek additional time.

statements.  *See Ballard*, 548 F.3d at 1137 ("Unless a party files an affidavit under Federal Rule of Civil Procedure 56(f) showing what facts further discovery may uncover, 'a district court generally does not abuse its discretion in granting summary judgment on the basis of the record before it.'" (quoting *Nolan v. Thompson*, 521 F.3d 983, 986 (8th Cir. 2008)).

### 3.    Conclusion

For the foregoing reasons, the court shall grant the Motion to the extent it seeks summary judgment on Dr. Reeder's slander claim.

## C.  Civil Conspiracy

Dr. Carroll submits that summary judgment in his favor is warranted on Dr. Reeder's civil conspiracy claim "because there is absolutely no evidence of any agreement between Dr. Carroll and the Board to act in concert to place Dr. Reeder in a false light." Motion at ¶ 6.  Dr. Reeder counters that such an argument is "disingenuous in light of the [Board's] refusal to offer testimony or evidence on critical components of its investigation and based on the credibility issues that arise out of [Dr. Carroll's] bald denial of wrongdoing." Resistance at 22.

"Under Iowa law, '[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful.'" *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 171 (Iowa 2002) (quoting *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232 (Iowa 1977)).  "Under this theory of liability, 'an agreement must exist between the two persons to commit *a wrong* against another.'" *Id.* (quoting *Ezzone v. Riccardi*, 525 N.W.2d 388, 398 (Iowa 1994)) (emphasis in *Wright*).

The court finds that Dr. Carroll is entitled to summary judgment on Dr. Reeder's civil conspiracy claim.  Simply put, Dr. Reeder sets forth absolutely no evidence of any agreement between Dr. Carroll and the Board to commit a wrong against Dr. Reeder.  Dr.

Reeder protests that Dr. Carroll "should not be permitted to rely upon the [Board's] confidentiality provisions to support an argument that there are no facts regarding an agreement . . ., particularly before any motion has been brought to challenge the [Board's] attempted invocation of the confidentiality provisions in a deposition." Resistance at 24. To date, Dr. Reeder has not filed such a motion in this court or, to the court's knowledge, any other. The court shall address the Motion on the record before it. Dr. Carroll's denial of an agreement with the Board, and the corresponding question of his credibility on this issue, by itself, is insufficient to overcome a properly supported summary judgment motion. *See Reasonover*, 447 F.3d at 578 ("Evidence, not contentions, avoids summary judgment."). The court shall grant the motion to the extent it seeks summary judgment on Dr. Reeder's civil conspiracy claim.

### D. Libel and False Light

First, the court considers which allegedly defamatory statements are at issue in Dr. Reeder's libel and false light claims. Then, the court shall consider whether a genuine issue of material fact exists with respect to these claims.

#### 1. Statements at issue

According to Dr. Carroll, Dr. Reeder purports to base his libel and false light claims on four items: the Letter, the Gregory Letter, the Unsigned Letter and the Email.[6]

---

[6] Out of an abundance of caution, the court finds it appropriate to consider whether each of these items could form the basis for Dr. Reeder's libel and false light claims. However, it appears that Dr. Reeder bases his claims on the Letter alone. The Letter is the only document Dr. Reeder specifically identifies in the Amended Complaint. In his Resistance, Dr. Reeder does not mention the Unsigned Letter or the Gregory Letter. He mentions the Email only once, but even then only as part of a discussion on Dr. Carroll's alleged "animus" towards the Surgery Center, rather than a stand-alone instance of defamation. *See* Resistance at 6. In contrast, Dr. Reeder's argument with respect to the issue of actual malice is focused entirely on the Letter. *See id.* at 13-17 (arguing that Dr. Carroll acted with actual malice and referring to "the Letter" at least fifteen times). The

(continued...)

Dr. Carroll argues that "the sole evidentiary basis of [Dr. Reeder's] claims is the Letter sent to the Board." Dr. Carroll's Brief in Support of the Motion ("Def. Brief") (docket no. 45-2) at 15.

### a. The Unsigned Letter

Dr. Carroll denies writing the Unsigned Letter and maintains that he had never seen it prior to his deposition in this case. He also contends that Dr. Reeder has no evidence that he wrote or published the Unsigned Letter. Dr. Reeder agrees, admitting that he "does not have any evidence that Dr. Carroll drafted or sent that letter to anyone." Def. Statement of Facts at ¶ 36; Dr. Reeder's Response ("Pl. Response") (docket no. 48-2) to Dr. Carroll's Statement of Facts at ¶ 36. In light of Dr. Reeder's concession, and his consequent failure to point to any evidence controverting Dr. Carroll's claim that he did not publish the Unsigned Letter, the court shall disregard the Unsigned Letter in its analysis of the Motion.

### b. The Gregory Letter

Dr. Carroll denies writing the Gregory Letter and insists that he had not seen it prior to his deposition in this case. He also denies knowing Dr. Gregory. Dr. Reeder acknowledged in his deposition that he does not know if Dr. Carroll wrote the Gregory Letter.[7] Nonetheless, he contends that "several facts, including the timing, substance, and

---

[6](...continued)
court's discussion of the other three items is necessary only to the extent that Dr. Reeder's claims could be construed as based on anything other than the Letter.

[7] The Gregory Letter was sent to Ed Knapp at the Board. It appears the Gregory Letter was also sent to the South Dakota Board of Medical & Osteopathic Examiners. *See* Def. App'x at 1 (depicting the Gregory Letter, which includes the notation "Cc SD Board of Medical & Osteopathic Examiners"). When asked whether he had "any evidence . . . that Dr. Carroll made any complaints against [him] to the South Dakota Board," Dr. Reeder testified "I do not have that evidence, no." *Id.* at 39. When asked whether he had "any evidence . . . that Dr. Carroll said anything about [him] to the Iowa Board of

(continued...)

addressee of the letter, support a reasonable inference that [Dr. Carroll] wrote the [Gregory Letter]." Def. Statement of Facts at ¶ 31; Pl. Response at ¶ 31. In support of this assertion, Dr. Reeder merely cites to the Letter and the Gregory Letter.

Although Dr. Reeder does not specify the purported "facts" that suggest Dr. Carroll wrote the Gregory Letter, he presumably refers to the fact that both letters were sent to the Board's Ed Knapp in February of 2004. Both letters also refer to Lohry's case. However, the similarities end there. The Gregory Letter provides little detail of Lohry's case and generally questions the wisdom of "perform[ing] an elective cervical surgery on the patient despite the patient being on plavix, (a blood thinner that has a PDR warning about bleeding)." Def. App'x at 1. The Gregory Letter goes on to discuss a "Dr. Ross Bacon" and states that "[b]laming anyone other than the surgeon is a cover-up." *Id.* The Gregory Letter provides two possible dates of death, and states that the author "believe[s] the patient was Dorothy Lohry." *Id.* In the Letter, by contrast, Dr. Carroll makes no mention of Lohry taking Plavix, does not mention Dr. Ross Bacon, does not allege any sort of cover up and states affirmatively that Lohry was the patient at issue. Dr. Carroll's Letter also provides detailed dates and medical information about Lohry's case and explains how Dr. Carroll came to acquire such information.

The court finds that Dr. Reeder simply has failed to put forth sufficient evidence to support a finding that Dr. Carroll wrote or published the Gregory Letter. Dr. Carroll denies writing the Gregory Letter. He testified that he does not know Dr. Gregory and had not seen the Gregory Letter until he was deposed in the instant action. Aside from pointing to the timing and addressee of the Gregory Letter, Dr. Reeder simply speculates that Dr. Carroll wrote or sent the Gregory Letter. Even affording Dr. Reeder all reasonable inferences, the jury would be left to speculate as well. Accordingly, the court

---

[7](…continued)
Medicine other than the [L]etter," Dr. Reeder testified "I do not." *Id.*

shall disregard the Gregory Letter in its analysis of the Motion.

### c.    *The Email*

Dr. Carroll admits he wrote the Email to Dr. Andres, but notes that, although it refers to the Surgery Center, and perhaps implicitly to CNOS, it makes no reference to Dr. Reeder. The only statement in the Email that arguably could be considered defamatory is the statement that "[t]his group has done so much damage to the reputation of the majority of the medical community in Sioux City that play by the rules." Def. App'x at 3. As Dr. Carroll points out, CNOS is not a party to this action. Thus, Dr. Carroll argues that "CNOS, not [Dr. Reeder], would have standing to bring a claim against Dr. Carroll for the allegedly defamatory statements regarding CNOS." Def. Br. at 9-10.

Dr. Reeder acknowledges that the Email does not refer to him. He also concedes, as he must, that CNOS is not a party to this case. However, he states that the Email "refers to an entity in which Dr. Reeder holds an ownership interest and serves as a board member." Def. Statement of Facts at ¶ 27; Pl. Response at ¶ 27.

As previously noted, to be actionable, a defamatory statement must be "of and concerning the plaintiff." *Taggart*, 549 N.W.2d at 802. "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." Restatement (Second) of Torts § 564. In other words, "[i]t is necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff." *Id.* cmt. a.

In some circumstances, an individual member of a group may have a defamation claim based upon a defamatory statement concerning the group. Section 564A of the Restatement sets forth what is known as the "group defamation" doctrine, and states:

> One who publishes a defamatory matter concerning a group or class of persons is subject to liability to an individual member if, but only if,
>
> (a) the group or class is so small that the matter can reasonably

be understood to refer to the member, or

> (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.

*Id.* at § 564A. In *Ball v. Taylor*, the Eighth Circuit Court of Appeals considered the argument that the Iowa Supreme Court has not adopted the group defamation doctrine. 416 F.3d 915, 917 (8th Cir. 2005) (per curiam). The Eighth Circuit Court of Appeals held that, regardless of whether the Iowa Supreme Court would adopt the doctrine, the Iowa Supreme Court:

> has interpreted the third element [of a defamation claim] in a manner consistent with the group defamation exception: Although defamatory words must refer to an ascertainable person, the plaintiff need not be named "if the alleged libel contains matters of description or other references therein, or the extraneous facts and circumstances . . . show that plaintiff was intended to be the object of the alleged libel, and was so understood by others."

*Id.* (quoting *Wisner v. Nichols*, 143 N.W. 1020, 1025 (Iowa 1913)).

The court concludes that, as a matter of law, Dr. Carroll's statements in the Email could not reasonably be understood to be of and concerning Dr. Reeder. The parties offer no argument and point the court to no evidence regarding the size of CNOS or the circumstances of the Email's publication. However, the Email refers only to "[t]his group" and nothing suggests that "the circumstances of the publication reasonably give rise to the conclusion that there is particular reference to" Dr. Reeder. Restatement § 564A (*cited with approval in Ball*, 416 F.3d at 918); *see also Wisner*, 143 N.W. at 1025. Therefore, the court concludes that the recipient, Dr. Andres, could not have "correctly, or mistakenly but reasonably, underst[ood] that [the allegedly defamatory statement] was intended to refer" to Dr. Reeder. Restatement § 564.

Dr. Carroll is not liable to Dr. Reeder for any allegedly defamatory statement in the Email unless the statement was "of and concerning" Dr. Reeder. *See Taggart*, 549

N.W.2d at 802. Dr. Reeder puts forth no evidence to support a finding that Dr. Andres understood Dr. Reeder to be the object of any allegedly defamatory statement in the Email. Accordingly, Dr. Carroll is entitled to summary judgment on Dr. Reeder's defamation claims to the extent such claims are based on the Email. *Cf. Ball*, 416 F.3d at 917-18 (reversing grant of summary judgment based on group defamation doctrine because, "[a]lthough [the defendant] did not state the employees' names individually, he referred to them as a group, stated he was suing them because they had committed fraud, then handed his audience copies of the complaint, which identified the individual employees by name in the caption and contained their names, addresses, and positions in an appendix"); *Brummett v. Taylor*, 569 F.3d 890, 892 (8th Cir. 2009) (affirming grant of judgment as a matter of law and stating "we agree with the district court that plaintiffs presented insufficient evidence 'to establish that anyone in [the defendant's] audience understood the individual plaintiffs to be the object of his statements"). The court shall disregard the Email in its analysis of the Motion.

### d. Conclusion

The court concludes that, to the extent Dr. Reeder bases his libel and false light claims on all four documents discussed above, the only legitimate basis for such claims is the Letter itself. With this in mind, the court turns to consider Dr. Reeder's libel and false light claims.

## 2. Application

### a.    Immunity and qualified privilege[8]

Dr. Carroll argues that he is immune from civil liability for his allegedly defamatory statements to the Board.  He also contends that the allegedly defamatory statements are protected by the qualified privilege.  Because both of these claimed defenses ultimately turn on whether Dr. Carroll acted with malice, the court considers them together.

### i.    Chapter 653 immunity

It is undisputed that Dr. Carroll is a "licensee" within the meaning of Chapter 653. Licensees are subject to a mandatory reporting requirement, which directs that "[a] report shall be filed with the [B]oard when a licensee has knowledge as defined in this rule that another person licensed by the [B]oard may have engaged in reportable conduct." Iowa Admin. Code r. 653-22.2(2).  "Knowledge" is defined as "any information or evidence of reportable conduct acquired by personal observation, from a reliable or authoritative source, or under circumstances causing the licensee to believe that wrongful acts or omissions may have occurred." *Id.* at r. 653-22.2(1).  "Reportable conduct" is defined as:

> wrongful acts or omissions that are grounds for license revocation or suspension under these rules or that otherwise constitute negligence, careless acts or omissions that demonstrate a licensee's inability to practice medicine competently, safely, or within the bounds of medical ethics, pursuant to Iowa Code sections 272C.3(2) and 272.4(6) and 653—Chapter 23.

---

[8] The court's analysis with respect to Dr. Carroll's claims of qualified privilege and Chapter 653 immunity applies equally to Dr. Reeder's libel and false light claims. *See* Iowa Admin. Code r. 653-22.2(2)(f) (stating that a licensee shall not be "civilly liable" for filing a report with the Board unless it is done with malice); Restatement § 652G (providing that the privileged occasions set out in Restatement §§ 594 to 598A also "apply to the publication of any matter that is an invasion of privacy").

*Id.*

"Failure to report a wrongful act or omission in accordance with this rule within the required 30-day period shall constitute a basis for disciplinary action against the licensee who failed to report." *Id.* at r. 653-22.2(2)(e). "A licensee shall not be civilly liable as a result of filing a report with the [B]oard so long as such report is not made with malice." *Id.* at r. 653-22.2(2)(f).

Dr. Carroll argues that, as a licensee, he "was required to make a report to the Board if he had any information under circumstances causing him to believe that [Dr. Reeder] may have engaged in wrongful acts or omissions." Def. Br. at 19. Therefore, Dr. Carroll contends that he is immune from liability for his allegedly defamatory statements unless he acted with malice. Dr. Reeder challenges the underlying premise of Dr. Carroll's immunity claim. That is, Dr. Reeder asserts that Dr. Carroll did not have a mandatory reporting obligation in the first place because he did not have the requisite "knowledge" of reportable conduct.

As noted above, Chapter 653 defines "knowledge" as "any information of reportable conduct acquired by personal observation, from a reliable or authoritative source, or under circumstances causing the licensee to believe that wrongful acts or omissions may have occurred." Iowa Admin. Code r. 653-22.2(1). Dr. Reeder submits that Dr. Carroll lacked knowledge of reportable conduct because he did not personally observe Lohry's treatment and his conversation with Dr. Bainbridge did not constitute a "reliable or authoritative source" because it was "part of a casual conversation" and Dr. Bainbridge was not present for Lohry's surgery or follow-up care. Resistance at 18.

Dr. Reeder's argument overlooks the last clause of Chapter 653's definition of knowledge, which states that knowledge includes "*any information* or evidence of reportable conduct acquired . . . under circumstances causing the licensee to believe that wrongful acts or omissions *may have occurred*." Iowa Admin. Code r. 653-22.2(1)

(emphasis added). Thus, even if Dr. Carroll did not personally observe Lohry and Dr. Bainbridge was not a reliable or authoritative source, Dr. Carroll still could acquire the requisite knowledge to trigger the reporting obligation.

Dr. Reeder's position also appears to impose a higher knowledge threshold than Chapter 653 requires. The reporting obligation arises if a licensee has knowledge that a wrongful act or omission *"may have* occurred." *Id.* Thus, Dr. Reeder's argument that Dr. Carroll's information "barely rose to the level of reasonable suspicion," Resistance at 19, misses the point. Dr. Carroll testified that, after hearing of Lohry's death from Dr. Bainbridge, the case reminded him of Smith and Carr, both of whom underwent similar surgeries by Dr. Reeder. Dr. Carroll personally observed Smith and Carr in his capacity as the medical examiner. The fact that he did not ultimately perform an autopsy on Lohry does not preclude him from acquiring the requisite knowledge to trigger Chapter 653's reporting requirement. The court finds, as a matter of law, that Dr. Carroll had knowledge of reportable conduct and was therefore subject to Chapter 653's mandatory reporting obligation. Accordingly, he is immune from civil liability for the Letter unless he published it with malice.

### ii.    *Qualified privilege*

Dr. Carroll also contends that Dr. Reeder's claims are barred by qualified privilege.[9] By arguing that Dr. Carroll acted with actual malice, Dr. Reeder apparently concedes that Dr. Carroll's statements in the Letter would ordinarily be protected by the qualified privilege. *See* Resistance at 12-13 (noting that the qualified privilege is lost when the publisher acts with actual malice and arguing that Dr. Carroll acted with actual malice). For the reasons explained below, the court agrees that the occasion of Dr. Carroll's

---

[9] The court notes that Dr. Carroll couches this argument in terms of the four element test that the Iowa Supreme Court abandoned in *Barreca*. *See* Def. Br. at 20 (citing four factor test set forth in *Winckel*).

statements to the Board were qualifiedly privileged on several grounds.

As previously noted, it is appropriate to turn to the Restatement's recitation of privileged occasions, several of which are applicable here. The court finds, as a matter of law, that Dr. Carroll's allegedly defamatory statements were made: (1) in furtherance of the protection of Dr. Carroll's interests; (2) to protect the interests of the recipient or a third person; and/or (3) as a communication to those who may act in the public interest. *See Barreca*, 683 N.W.2d at 118 (stating that whether defamatory statements were published on a "privileged occasion" is "[g]enerally . . . for the judge"). Accordingly, Dr. Carroll's allegedly defamatory statements were qualifiedly privileged on any or all of these grounds.

A publication is privileged "if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest." Restatement § 594. Here, Chapter 653 imposes a mandatory reporting obligation on physicians who have knowledge of reportable conduct. A failure to report such conduct "constitute[s] a basis for disciplinary action against the licensee who failed to report." Iowa Admin. Code r. 653-22.2(2)(e). Nebel testified that the Board has filed charges against a physician for failure to report and sanctions were taken against the non-reporting physician. Under these circumstances, the court finds that the occasion of Dr. Carroll's allegedly defamatory statements to the Board were privileged. The statements were made to protect Dr. Carroll's interest in complying with his reporting obligations as a physician and he made the statements to the Board, as Chapter 653 requires. Thus, the statements were made to protect his interest in carrying out his reporting obligations under Iowa law.

Similarly, the court finds that Dr. Carroll's statements were made to protect the interest of the recipient or a third person. A publication is privileged if the circumstances

33

induce a correct or reasonable belief that:

> (a) there is information that affects a sufficiently important interest of the recipient or a third person, and

> (b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.

Restatement § 595. As explained above, Dr. Carroll was under a legal duty to file a report with the Board when he acquired knowledge that reportable conduct may have occurred. Here, the Board has a sufficiently important interest in ensuring that physicians licensed in the state of Iowa are able to practice medicine competently and safely. The citizens of Iowa obviously share in this interest. Accordingly, Dr. Carroll's statements to the Board are privileged because they were made to protect the recipient and/or a third person.

Finally, the court finds that Dr. Carroll's statements are privileged because they were made to one who may act in the public interest. A publication is privileged if the circumstances induce a correct or reasonable belief that "(a) there is information that affects a sufficiently important public interest, and (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true." Restatement § 598. For the reasons explained with regard to Restatement § 595, the Board and the public share a sufficiently important interest in ensuring the competency and safety of physicians practicing in the state of Iowa. By submitting the Letter to the Board, Dr. Carroll published the allegedly defamatory statements to "a public officer . . . who is authorized or privileged to take action if the defamatory matter is true." *Id.*; Iowa Admin. Code r. 653-1.2(17A) (charging the Board with "the investigation of violations or alleged violations of statutes and rules relating to the practice of medicine and surgery" and "the imposition of discipline upon licensees"). Accordingly, Dr. Carroll's statements are qualifiedly privileged on this ground as well.

### b.    Malice

In light of the court's finding that Dr. Carroll's statements in the Letter were made pursuant to his Chapter 653 reporting obligation and are qualifiedly privileged, the remaining question is whether actual malice negates these protections. *See* Iowa Admin. Code r. 653-22.2(2)(f) (providing civil immunity "so long as such report is not made with malice"); *Barreca*, 683 N.W.2d at 121 ("[T]o defeat a qualified privilege, a plaintiff must prove the defendant acted with knowing or reckless disregard of the truth of a statement"). Dr. Reeder bears the burden of proving Dr. Carroll acted with actual malice. *See Kelly*, 372 N.W.2d at 296.

Although Chapter 653 does not define "malice," both parties turn to the definition of actual malice applied in questions of qualified privilege; that is, a knowing or reckless disregard for the truth of a statement. The court shall do the same. Nothing suggests that the use of "malice" in Chapter 653 means anything different than it does in the qualified privilege context. Because Chapter 653 refers to "malice" in the context of filing a report with the Board, it is logical to give the term the same meaning it has in the realm of defamation and qualified privilege. Accordingly, the court's malice analysis is equally applicable to both issues. If Dr. Carroll acted with actual malice, his statements would lose the qualified privilege and he would not be entitled to immunity under Chapter 653.

In *Barreca*, the Iowa Supreme Court explained:

> reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. The actual malice standard requires a high degree of awareness of probable falsity.

683 N.W.2d at 123 (quoting *Caveman Adventures*, 633 N.W.2d at 762).

### i.    Parties' arguments

Dr. Carroll contends that the Board's actions foreclose any possibility that he acted with malice:

> Dr. Carroll could not have known or entertained serious doubt as to the truth of his Letter, let alone a high degree of awareness of probable falsity of his Letter, when the Board, through its four-year screening process, investigation, and peer review, believed there was probable cause for taking disciplinary action against [Dr. Reeder].

Def. Br. at 19-20.

Dr. Reeder argues that a reasonable jury could find Dr. Carroll acted with actual malice because: (1) Dr. Carroll harbors animosity towards physician-owned surgery centers and their physician owners; (2) Dr. Carroll's profits are tried to St. Luke's success; (3) Dr. Carroll's Letter included statements that were "irrelevant and unrelated" to Lohry's case, Resistance at 15; (4) Dr. Carroll based his statements on "uncorroborated information" and did not adequately investigate his statements; and (5) Dr. Reeder was ultimately cleared of wrongdoing.

### ii.    Analysis

The court finds that, as a matter of law, Dr. Carroll's statements were not made in a knowing or reckless disregard of their truth. Dr. Carroll's own allegations in the Amended Complaint make clear that at least one peer reviewer found that Dr. Reeder's care was substandard. Dr. Reeder also concedes that, after an approximately four year investigation, the Board filed a statement of charges, finding there was probable cause to take disciplinary action against him. For these reasons, and those explained below, the court finds that a reasonable jury could not find that Dr. Carroll published the Letter with actual malice.

Dr. Reeder argues that Dr. Carroll "had a longstanding history of animosity towards

Dr. Reeder and other physicians who held ownership interests in surgery centers."[10] Resistance at 13. He asserts that Dr. Carroll "had long harbored strong, negative feelings regarding Dr. Reeder, CNOS, and the Surgery Center," which included "ill-will" and "strong, deeply rooted feelings of animosity and resentment towards physician owners of surgery centers . . . ." *Id.* There is no evidence to support these claims. With respect to physician-owned surgery centers generally, the evidence shows merely that Dr. Carroll holds a personal opinion that such ownership is unethical. No evidence suggests that this opinion reached heights of "strong, negative feelings," "ill-will" or "animosity." With respect to Dr. Carroll's view of Dr. Reeder specifically, there is no evidence the he held any view whatsoever, much less feelings of ill-will, bias or animosity.

The court also rejects Dr. Reeder's argument that an inference of malice may be drawn from Dr. Carroll's inclusion of so-called "irrelevant and unrelated statements," Resistance at 15, about Carr and Smith. Dr. Reeder argues that, because Dr. Carroll did not report these cases to the Board until long after he learned of them, "a reasonable inference can be drawn that [Dr. Carroll] did not believe that the situations involving Messrs. Carr and Smith warranted reporting." *Id.* However, Dr. Carroll explains that it was not until he learned of Lohry's case "that it occurred to [him] that the three deaths had a nexus: procedures performed by Dr. Reeder." Reply at 4. The evidence supports this claim. Dr. Carroll testified that he wrote the Letter after Lohry's case reminded him of Smith and Carr because he considered all three patients high risk, all three had a similar

---

[10] In *Barreca*, the Iowa Supreme Court "abandon[ed] the old common law 'improper purpose' definition of 'actual malice' in favor of the *New York Times* test, which focuses upon whether the defendant published the statement with a knowing or reckless disregard for its truth." 683 N.W.2d at 123. The now-discarded improper purpose definition focused "on an inquiry into the motives of the publisher." *Id.* at 121. Despite the Iowa Supreme Court's abandonment of this definition of "actual malice," "evidence of a defendant's ill-will towards the plaintiff" may be admissible if it is "probative to show knowledge of falsity or reckless disregard for the truth." *Id.* at 123 n.8.

procedure, Dr. Reeder performed all three operations and all three suffered adverse outcomes.[11]

Dr. Reeder also argues that Dr. Carroll's lack of surgical expertise and independent investigation support a reasonable inference that he acted with actual malice. "[A] failure to investigate, standing alone, ordinarily will not establish a knowing or reckless disregard for the truth . . . ." *Barreca*, 683 N.W.2d at 123. However, a failure to investigate coupled with other factors may establish actual malice. *See id.* (reversing summary judgment where the defendant published allegations to the public, including at a public meeting and to local media outlets, "with no basis other than an anonymous and uncorroborated tip" and the defendant's statements before the city council "arguably show[ed] he entertained serious doubts about the truth of the [anonymous] phone call"). Unlike *Barreca*, Dr. Carroll acquired personal knowledge of two cases—Smith and Carr—by performing their autopsies, and learned of Lohry's case from Dr. Bainbridge. Based on his knowledge of the three cases, Dr. Carroll wrote the Letter summarizing each case. He explained that he did so because he believed the Board had the resources to conduct an investigation, including peer review. Also unlike *Barreca*, there is no evidence that Dr. Carroll shared the information contained in the Letter with anyone other than the Board—the body charged with investigating such issues. While Dr. Carroll certainly could have endeavored to conduct a more thorough investigation, "'reckless conduct is not measured by whether a reasonably prudent man . . . would have investigated before publishing.'" *Id.* (quoting *Caveman Adventures*, 633 N.W.2d at 762).

---

[11] Dr. Reeder also takes issue with Dr. Carroll's inclusion of the statement that he had "overheard other physicians state that Dr. Reeder has been investigated by Mercy Medical Center in Sioux City for concerns related to quality of patient care but I am not familiar with any of those cases." Def. App'x at 5. Dr. Reeder argues that this statement is "nothing more than specious innuendo for which [Dr. Carroll] had no personal knowledge." Resistance at 15. This argument misses the point. Dr. Carroll acknowledged in the statement itself that he lacked personal knowledge of any other cases.

Dr. Reeder's reliance on the Board's ultimate dismissal of charges is also misplaced. It is true that "unfounded allegations reasonably give rise to an inference of intent to do harm to the target of those allegations." *King v. Sioux City Radiological Group, P.C.*, 985 F. Supp. 869, 881 (N.D. Iowa 1997) (holding, pre-*Barreca*, that a genuine issue of material fact existed as to the absence of actual malice where investigation revealed that allegations were unfounded). However, Dr. Reeder's argument ignores the fact that the Board conducted a nearly four year investigation, including peer review, before concluding that there was probable cause to charge him with professional incompetency and engaging in practice harmful or detrimental to the public. Although the Board ultimately dismissed the case because it was "unable to prove that Dr. Reeder's care in those cases fell below the standard of care," Pl. App'x at 57, a reasonable jury could not conclude that the statements in the Letter were unfounded.

Dr. Reeder's remaining basis for a finding of actual malice is Dr. Carroll's financial stake in St. Luke's success. While the court agrees that, in certain circumstances, a defendant's financial interest could lend weight to an inference of actual malice, that is not the case here. Dr. Reeder points to nothing more than Dr. Carroll's bare financial interest in St. Luke's success. Without more, the court concludes that this is insufficient to support a finding that Dr. Carroll published the statements in the Letter with actual malice.

### c. Conclusion

The court concludes, as a matter of law, that Dr. Carroll did not act with actual malice in publishing the statements in the Letter. Dr. Reeder puts forth no evidence that Dr. Carroll knew his statements were false. Nor is there "'sufficient evidence to permit the conclusion that [Dr. Carroll] in fact entertained serious doubts as to the truth of his publication.'" *Barreca*, 683 N.W.2d at 123 (quoting *Caveman Adventures*, 633 N.W.2d at 762). Because he did not publish the statements with actual malice, Dr. Carroll's statements in the Letter are qualifiedly privileged. For the same reason, he also is immune

from civil liability for the statements pursuant to Iowa Administrative Code r. 653-22.2(2)(f).  Accordingly, the court shall grant the Motion to the extent it seeks summary judgment with respect to Dr. Reeder's libel and false light claims.[12]

## VII.  CONCLUSION

In light of the foregoing, the Motion (docket no. 45) is **GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Thomas Carroll, M.D., and to **CLOSE THIS CASE**.

**IT IS SO ORDERED**.

**DATED** this 21st day of December, 2010.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

---

[12] In light of the court's conclusions with respect to Dr. Reeder's claims, it need not consider Dr. Carroll's alternative argument that the statute of limitations bars all of Dr. Reeder's claims.